## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 19 2016, 6:29 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Benjamin K. Read
Jeffersonville, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of S.S., Mother,[1] and A.C., Father, and H.S., Child:

A.C.,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

April 19, 2016

Court of Appeals Case No. 10A05-1507-JT-910

Appeal from the Clark Circuit Court

The Honorable Vicki L. Carmichael, Judge

Trial Court Cause No. 10C04-1503-JT-14

---

[1] Mother does not participate in this appeal; however, according to Indiana Appellate Rule 17(A), a party of record in the trial court shall be a party on appeal.



*Appellee-Petitioner.*

**Kirsch, Judge.**

A.C. ("Father") appeals the juvenile court's order terminating his parental rights to his child, H.S. ("Child").  Father raises several issues for our review that we consolidate and restate as:

> I.  Whether Father's due process rights were violated when he did not have visitation with Child; and

> II.  Whether the juvenile court's termination order is clearly erroneous.

We affirm.

## Fact and Procedural History

Father is the biological father of Child, born August 15, 2011.[2]  The Indiana Department of Child Services ("DCS") became involved with Child due to a

---

[2] Child's mother, S.S., signed a voluntary termination of her parental rights, and the juvenile court terminated her parental rights; however, she does not participate in this appeal.

report that she was born positive for opiates. S.S. ("Mother") also tested positive for opiates at that time. At the time of Child's birth, Father was incarcerated. On September 20, 2011, DCS filed a petition alleging that Child was a child in need of services ("CHINS"). On October 25, 2011, both Father and Mother admitted that Child was a CHINS, and the juvenile court adjudicated Child as such. At that time, Child remained in Mother's care, but Father was still incarcerated.

[4] A dispositional hearing was held, and the juvenile court issued an order ordering Father to participate in the following services:

> A. Maintain consistent contact with DCS Family Case Manager including responding to correspondence and telephone messages within a reasonable amount of time. Contact the DCS Family Case Manager by telephone at least once every other week;
>
> B. Notify the DCS Family Case Manager of any changes in address, telephone number, people living in the home, or employment within forty-eight (48) hours of said change;
>
> C. Sign any necessary releases with service providers, probation officers, or medical providers to enable the DCS Family Case Manager to monitor compliance with court orders;
>
> D. Refrain from using illegal drugs. Only take prescription medication in the doses and frequencies as specified in the prescription; and
>
> E. Contact the DCS Family Case Manager to determine if additional services are necessary.

*Appellant's App.* at 24.

[5]     On January 9, 2012, Child was removed from Mother's care due to drug use, not following court orders, and a report that Mother had gone to Tennessee and taken Child with her. At that time, Child was placed with the maternal grandfather and his wife (together, "Grandparents"), where she has remained for the duration of the case. Father remained incarcerated for the length of the CHINS case. He was serving his sentence for April 2012 convictions of burglary and conspiracy to commit robbery. Through much of his incarceration, he was either at the Floyd County Jail or at the Branchville Correctional Facility ("Branchville"). Prior to DCS involvement with Child, Father had not established paternity of Child. In January 2013, Father participated in a paternity test that confirmed that he was the biological father of Child. During the first few months of Child's life before removal from the home, Mother sometimes took Child to visit Father at both the Floyd County Jail and the Clark County Jail. After he was transferred to Branchville, Father would sometimes speak with Child on the phone.

[6]     In October 2013, a court-ordered visitation between Child and Father was to occur at the jail, but Child developed foot and mouth disease and the visitation was cancelled as Child's doctor said she should not go outside the home. On February 20, 2014, the juvenile court ordered that Father have video contact with Child through Father's sister ("Aunt") if she passed background checks. DCS family case manager ("FCM") Amanda Rutherford ("FCM Rutherford") spoke with Aunt about the video visits several times, but Aunt was not able to

get any set up until March 20, 2015, at which time Father had been transferred from Branchville to the Clark County Jail. Child's therapist, Lisa Clark ("Clark"), recommended that Child not have visitation with Father because "an incarcerated setting would not be appropriate" for Child as Child would be in an unfamiliar setting and would be "looking at a screen or on a phone being unaware of exactly what . . . she's supposed to be doing." *Tr.* at 14. Clark also expressed concern due to the fact that Child had never met Father, and she did not think that a jail setting was appropriate for a three-year-old. There was also concern due to the fact that Child suffered from separation anxiety and that she would have increased anxiety in an incarcerated setting.

[7] Due to her separation anxiety, Child would cry so much at daycare that Grandparents thought of removing her, but Clark did not recommend it and told them Child would slowly get more comfortable. Child progressed in therapy, and Clark attributed the progress to Child being in a familiar setting and becoming more comfortable with Grandparents.

[8] On March 27, 2015, DCS filed a petition to terminate Father's parental rights. An evidentiary hearing was held on May 7, 2015. At the time of the termination hearing, Father was incarcerated at Branchville and had been incarcerated for Child's entire life. His projected release date was November 23, 2016. Child was three-and-a-half years old at the time of the hearing, and in that time, Father had never resided with Child, had never had exclusive care and custody of Child, and had never paid any support for Child. Since Child was four months old, she had resided with Grandparents, and Child's younger

brother also lived in the home. Grandfather had never met Father, and Father had made no attempts to contact Grandparents.

[9] Evidence was presented regarding Father's criminal history. In June 2004, Father pleaded guilty to Class D felony possession of two or more precursors and was sentenced to three years with two and a half years suspended. In December 2004, he pleaded guilty to Class A misdemeanor possession of a handgun without a license and was sentenced to one year all suspended. In April 2005, Father pleaded guilty to Class A misdemeanor check deception and was sentenced to one year all suspended, and in October 2005, he pleaded guilty to Class A misdemeanor conversion and was sentenced to one year suspended to time served. In February 2008, he pleaded guilty to Class B felony robbery and was given a ten-year sentence with five years suspended to probation, and on April 26, 2012, he was convicted of Class B felony burglary and Class C felony conspiracy to commit robbery, for which he was still in prison on the date of the termination hearing with a projected release date of November 23, 2016. Additionally, each time Father was placed on probation, a probation violation was filed, and he was ordered to serve some of his suspended sentence.

[10] At the termination hearing, Father presented evidence that while incarcerated he had participated in services, which included: 24/7 Dads; in-patient, out-patient Dads; Spiritual Literacy; Seven Habits of Highly Effective People; Mothers Against Methamphetamine; and Purposeful Living Unit Services program. *Tr.* at 51-53, 57. Father also testified that he sees a therapist every

other week while incarcerated. *Id*. at 54. He was also enrolled in the Department of Labor Apprenticeship Program ("DOL Program"), which when completed would allow him to receive a time cut and give him a release date of May 25, 2016. After completing the DOL Program, Father would also be eligible for substance abuse counseling, and he stated he intended to seek an out-patient substance abuse program when released from incarceration.

[11] During the evidentiary hearing, FCM Rutherford testified that Child had been removed from the home for three years and needed permanency and stability, and therefore, termination and adoption were in Child's best interests. *Id*. at 107, 113. FCM Rutherford stated that she based her recommendations on Father's incarceration and his lack of a bond with Child. *Id*. at 113-14. Additionally, the Court Appointed Special Advocate ("CASA") testified that termination was in the best interests of Child because Father was due to be incarcerated for at least another year, Child did not know Father, and it would be traumatic to remove Child from the only home she has ever known. *Id*. at 79-80. DCS planned for Child to be adopted upon termination of parental rights, and Grandparents intended to adopt Child. On July 2, 2015, the juvenile court issued its findings, conclusions, and order terminating Father's parental rights. Father now appeals.

# Discussion and Decision

## I. Due Process Violation

[12] The Due Process Clause of the U.S. Constitution prohibits state action that deprives a person of life, liberty, or property without a fair proceeding. *In re C.G.*, 954 N.E.2d 910, 916 (Ind. 2011) (citing *In re Paternity of M.G.S.,* 756 N.E.2d 990, 1004 (Ind. Ct. App. 2001), *trans. denied*). When the State seeks to terminate the parent-child relationship, it must do so in a manner that meets the requirements of due process. *Id*. at 917. Although due process has never been defined, the phrase embodies a requirement of fundamental fairness. *Id*. The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. *Id*. (citing *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)).

[13] In determining if a parent's due process rights have been violated in a termination of parental rights proceeding, the following three factors are balanced: (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure. *Id*. (citing *A.P. v. Porter Cnty. Office of Family & Children,* 734 N.E.2d 1107, 1112 (Ind. Ct. App. 2000), *trans. denied*). "The balancing of these factors recognizes that although due process is not dependent on the underlying facts of the particular case, it is nevertheless 'flexible and calls for such procedural protections as the particular situation demands.'" *Id*. (quoting *Mathews*, 424 U.S. at 334). Both a parent's interest in the care, custody, and control of his child and the State's

interest in protecting the welfare of a child are substantial, and therefore, when assessing if there has been a denial of due process, we focus on the risk of error created by the State's actions. *Id.* at 918.

[14] Father argues that his due process rights were violated because he was not afforded visitation with Child even though he repeatedly requested visitation through DCS. He contends that, although the juvenile court ordered video visitation, he was not able to have contact with Child because she was ill, and even after she recovered, no other visitations were arranged. Father also claims that DCS obtained a therapist's recommendation that visitations not occur because they would be harmful to Child. He asserts that since DCS was in the best position to ensure that visitations occurred between him and Child, he was denied due process when DCS failed to allow him to have visitation with Child.

[15] Initially, we note that Father has waived this argument by failing to raise it during the CHINS case or termination proceedings. It is well established that a party on appeal may waive a constitutional claim. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 194 (Ind. Ct. App. 2003). Generally, an issue cannot be raised for the first time on appeal, and when a party does so, it waives the claim. *In re K.S.,* 750 N.E.2d 832, 834 n.1 (Ind. Ct. App. 2001) (finding mother's claim that her due process rights were violated was waived because she raised the claim for the first time on appeal). Here, Father does not point to any place in the record where he raised this due process issue to the juvenile court. Therefore, as Father is raising this issue for the first time on appeal, we conclude that he has waived his claim.

[16] Waiver notwithstanding, Father's argument fails. DCS is not required to offer a parent services aimed at reunification with the child when the parent is incarcerated. *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 377 (Ind. Ct. App. 2006) (determining DCS's failure to offer incarcerated parent services did not constitute a deprivation of due process rights), *trans. denied*. "[T]he law concerning termination of parental rights does not require [DCS] to offer services to the parent to correct the deficiencies in childcare.'" *In re B.D.J.*, 728 N.E.2d 195, 201 (Ind. Ct. App. 2000). "'Individuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children.'" *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cnty. Office*, 989 N.E.2d 1225, 1235-36 (Ind. 2013) (quoting *In re A.C.B.,* 598 N.E.2d 570, 572 (Ind. Ct. App. 1992)).

[17] Here, the evidence showed that Father had been incarcerated since before Child was born and had only seen her a few times when she was less than four months old and before she was removed from Mother's care. Clark, Child's therapist, recommended against Child visiting Father in prison because an incarcerated setting would not be appropriate for Child, who was only three and a half years old. Clark also expressed concern due to the fact that Child had never met Father, and due to the fact that Child suffered from separation anxiety and that she would have increased anxiety in an incarcerated setting.

[18] Further, although visitation never occurred after Child became a ward of DCS, the juvenile court did order visitation to occur in October 2013, which was unable to take place due to Child becoming ill. Later, in February 2014, the

juvenile court ordered video visitation to occur through Aunt, but she was not able to set up any visitations until March 20, 2015. Therefore, based on the evidence, visitation was actually court-ordered, but did not occur due to other issues. Additionally, although the therapist did recommend against visitations due to the incarcerated setting, restrictions on visitations and services are justified when a parent is incarcerated and do not constitute a due process violation. *See Castro*, 842 N.E.2d at 377. Father has not demonstrated any violation of his due process rights.

## II. Termination Order Not Clearly Erroneous

[19] We begin our review by acknowledging that this court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied*. When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re B.J.*, 879 N.E.2d at 14.

[20] Here, in terminating Father's parental rights to Child, the juvenile court entered specific findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard

of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id*. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.*

[21] The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution. *In re C.G.*, 954 N.E.2d 910, 923 (Ind. 2011). These parental interests, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *In re J.C.*, 994 N.E.2d 278, 283 (Ind. Ct. App. 2013). In addition, although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id*.

[22] Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

> (B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2). Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a) (emphasis added).

[23] In his argument, Father does not challenge any of the juvenile court's findings of fact. As Father does not challenge any of the juvenile court's findings of fact, these unchallenged facts stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied*;

*McMaster v. McMaster*, 681 N.E.2d 744, 747 (Ind. Ct. App. 1997) (when father failed to challenge specific findings, court accepted them as true).

[24]     Father argues that that DCS failed to prove the required elements for termination by sufficient evidence. Specifically, he contends that DCS failed to prove by clear and convincing evidence that the conditions that resulted in Child being removed would not be remedied because the juvenile court did not take proper consideration of his current abilities and progress made. Father further alleges that DCS failed to present sufficient evidence that the continuation of the parent-child relationship poses a threat to the well-being of Child because there was no evidence there would be any negative effect on Child if the relationship between her and Father continued. Father lastly asserts that DCS failed to prove by clear and convincing evidence that termination of his parental rights was in the best interests of Child because it was error to rely on the CASA's testimony, as a conclusion on this element should be based on the totality of the evidence and the CASA did not make contact with Father before making her determination.

[25]     In determining whether there is a reasonable probability that the conditions that led to a child's removal and continued placement outside the home would not be remedied, we engage in a two-step analysis. *K.T.K.*, 989 N.E.2d at 1231. First, "we must ascertain what conditions led to their placement and retention in foster care." *Id.* Second, "we 'determine whether there is a reasonable probability that those conditions will not be remedied.'" *Id.* (citing *In re I.A.*, 934 N.E.2d 1132, 1134 (Ind. 2010) (citing *In re A.A.C.*, 682 N.E.2d 542, 544

(Ind. Ct. App. 1997))). In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (quoting *K.T.K.,* 989 N.E.2d at 1231). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *Id.* Although trial courts are required to give due regard to changed conditions, this does not preclude them from finding that a parent's past behavior is the best predictor of their future behavior. *Id.*

[26] In the present case, the evidence showed that Child was removed from Mother's care in January 2012, due to Mother's drug use, not following court orders, and a report that Mother had gone to Tennessee and taken Child with her. At that time, Child was placed with Grandparents, where she has remained for the duration of the case. Father was incarcerated at the time of Child's birth and remained incarcerated for the entirety of the CHINS case and termination proceedings. Child was never placed in Father's care and custody because he was incarcerated at the time of removal and was still incarcerated at the time of the termination hearing with a projected release date of November 23, 2016. Further, after his release, Father planned to live in a halfway house, and Child would be unable to live there with him. Therefore, the reason for

Child's removal or the fact she was never placed in Father's care – his incarceration – had not been remedied at the time of the termination hearing.

[27] Father relies on *Rowlett v. Vanderburgh County Office of Family & Children*, 841 N.E.2d 615 (Ind. Ct. App. 2006), *trans. denied*, for his contention that evidence of his rehabilitation while incarcerated constituted changed circumstances. In *Rowlett*, although the father had a habitual pattern of criminal conduct and drug use prior to incarceration, the court reasoned that this past conduct did not accurately reflect the father's status and ability to care for his children at the time of the termination hearing because evidence was presented to show that the father had made positive strides toward turning his life around and was set to be released six weeks after the hearing. *Id*. at 621-22. However, in the present case, Father was not due to be released until a year and a half after the termination hearing, and he did not present any independent evidence to demonstrate the positive strides shown in *Rowlett*. At the evidentiary hearing, Father presented evidence that he participated in services while incarcerated and had made significant progress in improving himself through the programs he completed. However, other than Father's self-serving testimony, no other independent evidence was presented to support his contentions.

[28] Additionally, evidence was presented of Father's extensive criminal history, which included numerous convictions and probation violations. Father had been convicted of two misdemeanors and four felonies since 2004 and had violated his probation for each conviction prior to the ones for which he was incarcerated at the time of the hearing. A juvenile court must balance a

parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *In re E.M.*, 4 N.E.3d at 643. In making this determination, the juvenile court can properly consider evidence of a parent's prior criminal history. *In re D.B.*, 942 N.E.2d 867, 873 (Ind. Ct. App. 2011). Based on the evidence presented, we conclude that the juvenile court did not err in finding that there was a reasonable probability that the conditions that resulted in the removal and the reasons for continued placement of Child outside the home would not be remedied.

[29] Father also contends that DCS failed to prove by clear and convincing evidence that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to the well-being of Child. However, we need not address such argument. Indiana Code section 31-35-2-4(b)(2)(B) is written such that, to properly effectuate the termination of parental rights, the juvenile court need only find that one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence. *A.D.S.*, 987 N.E.2d at 1156. Therefore, as we have already determined that sufficient evidence supported the conclusion that the conditions that resulted in the removal of Child would not be remedied, we will not address any argument as to whether sufficient evidence supported the conclusion that the continuation of the parent-child relationship posed a threat to the well-being of Child.

[30] Father next argues that insufficient evidence was presented to prove that termination is in the best interest of Child. In determining what is in the best

interests of the child, the trial court is required to look at the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010) (citing *In re D.D.*, 804 N.E.2d at 267), *trans. dismissed.* In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *Id.* (citing *In re R.S.*, 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*). The trial court need not wait until the child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.* Additionally, a child's need for permanency is an important consideration in determining the best interests of a child, and the testimony of the service providers may support a finding that termination is in the child's best interests. *Id.* (citing *McBride,* 798 N.E.2d at 203).

[31]   Here, the evidence presented showed that Father was not able to provide for Child's needs and to provide her with the necessary stability and permanency. At the time of the termination hearing, Father was incarcerated, and he had been for the entirety of the CHINS case and Child's life. He was not due to be released until November 2016 and intended to live in a halfway house after his release for a period of time, a place where Child could not live with him. At the time of the hearing, Father would be incarcerated for at least another year and a half, and he did not know or have a relationship with Child. A parent's historical inability to provide a suitable environment along with the parent's current inability to do the same supports a finding that termination of parental

rights is in the best interests of the children. *In re A.P.*, 981 N.E.2d 75, 82 (Ind. Ct. App. 2012).

[32] Further, at the time of the termination hearing, Child had been living with Grandparents since removal and for most of her life. Evidence was presented that removing Child from the only home she has even known would be traumatic, particularly given that she suffered from separation anxiety. During the time that Child has lived with Grandparents, she has made progress in therapy, which Clark attributed to being in a familiar setting and becoming more comfortable with Grandparents. "Permanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d at 1265. FCM Rutherford testified that Child needed permanency and stability and that termination and adoption were in Child's best interests. *Tr.* at 107, 113. She based her recommendations on Father's incarceration and his lack of a bond with Child. *Id.* at 113-14. Further, the CASA testified that termination was in the best interests of Child because of Father's continued incarceration, Child's lack of a relationship with Father, and the trauma that could occur if Child was removed from the only home she has ever known. *Id.* at 79-80. Based on the above, we conclude that sufficient evidence was presented to prove that termination was in the best interest of Child.

[33] We will reverse a termination of parental rights "only upon a showing of 'clear error'-- that which leaves us with a definite and firm conviction that a mistake has been made." *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *In re Egly*, 592 N.E.2d 1232, 1235 (Ind. 1992)). Based on the record

before us, we cannot say that the juvenile court's termination of Father's parental rights to the Child was clearly erroneous. We therefore affirm the juvenile court's judgment.

[34] Affirmed.

[35] Mathias, J., and Brown, J., concur.